UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IMPULSE IMPORTS d/b/a IMPORT IMAGES, et. al.<br><br>  Plaintiffs<br><br>v.<br><br>GLOBAL PRINTS, INC. d/b/a CAMPUS SALES, et. al.<br><br>  Defendants. | )<br>)<br>)<br>)  05-11691 RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF PATRICK SMITH IN SUPPORT OF PLAINTIFFS' COMPLAINT AND EX-PARTE MOTION TO SEIZE INFRINGING MERCHANDISE

I, Patrick Smith, based upon my personal knowledge and upon information and belief, depose and state that:

1. I am the Chief Executive Officer of Impulse Images, Inc. d/b/a Import Images, ("Impulse"), one of the Plaintiffs in the above-captioned matter;

2. I am familiar with the facts and claims in issue between Impulse and Global Prints, Inc. d/b/a Campus Sales and Paul Kennedy (collectively "Defendants");

3. Impulse is a leading publisher of licensed posters and related articles and has entered into licensing agreements authorizing Impulse to manufacture and sell posters and prints of various musical artists, famous photographs, and other entertainment images to retail and wholesale establishments.

4. On or about June 1, 2003, Impulse entered into a licensing agreement with Hope Road to use Bob Marley's likeness and/or photograph along with Marley's

trademark and name on posters. The territory included under this agreement included the United States and Canada.

5. On or about August 10, 1999, Impulse entered into a licensing agreement with Artisan regarding merchandising in connection with the motion picture "Reservoir Dogs." Under this Agreement, Impulse was given the non-exclusive rights as a licensee to produce, publish and sell key art, still photographs, trademark and other images from the film. The agreement included the rights to produce posters in North America. In 2003, Lions Gate Entertainment acquired Artisan. On or about December 1, 2004, Lions Gate entered into a licensing agreement with Impulse pertaining to merchandising in connection with "Reservoir Dogs."

6. On or about May 10, 2004, Impulse entered into a licensing agreement with Dean, Inc. to use the name, likeness, voice, signature and visual representation of the late James Dean on posters, post cards and greeting cards. The territory covered under the agreement included North America, Japan and Australia.

7. On or about March 30, 2004, Impulse entered into a licensing agreement with Anthill which gave Impulse the right to manufacture, distribute and sell posters, including designs, characters, artwork, names, words, symbols, likenesses, trademarks, logographs and other indicia associated with individual bands and musical artists, including Pearl Jam and Sting. The territory designated in this agreement was North America.

8. On or about May 23, 2003, Impulse entered into a licensing agreement with Museum Masters giving Impulse the right to manufacture, distribute and sell

posters of images and works of the artist Salvator Dali. The territory granted under this agreement included North America.

9. On or about June 30, 2000, Impulse entered into a Master Merchandising License Agreement with Universal giving Impulse merchandising rights to posters and prints of images from "Army of Darkness" and "Carlito's Way".

10. Impulse is also a licensee named in an agreement with Metro-Goldwyn-Mayer, the parent company of Orion Pictures, which owns the trademark "Army of Darkness." This agreement gives Impulse the right to produce and manufacture posters bearing the trademark "Army of Darkness."

11. As the Chief Executive Officer of Impulse, I am familiar with all of the licensed designs for the above-named licensed products. In addition, through my years of experience in the poster industry, I am and have become familiar with the licensed products for all of the Plaintiffs' properties forming the basis of this action. While Import does not have licenses with each of the Plaintiffs, I am familiar with each of their licensed products and have received authority to commence this action along with Pyramid for infringement of the licensed designs. Annexed hereto are representative samples of the Plaintiffs' licensed posters designated at "L1"– "L10". Also annexed hereto for comparison are copies of the Defendants' infringing posters designated as "I1" – "I13."

12. As a result of our marketing and selling posters and other licensed product, Impulse has gained recognition as a provider of high quality licensed posters and other products. Impulse has authority under its agreements to use the registered trademarks, copyrighted images and other protected intellectual property depicted

on its products. All licensed products prominently display the appropriate trademark, copyright or other legal line information.

13. Impulse and the other Plaintiffs in this suit have actively marketed and sold their Licensed Products within numerous geographical territories, including the Commonwealth of Massachusetts.

14. Upon information and belief, the Defendants are in the business of manufacturing, distributing and selling posters and prints and are currently offering for sale posters that infringe the trademarks, copyrights, rights to publicity and other intellectual property rights of the Plaintiffs. Upon information and belief, the Defendants have been manufacturing, distributing and selling their infringing posters and prints bearing and/or depicting the Plaintiffs' protected intellectual property without a license and the products manufactured and sold by the Defendants are substantially similar to the Plaintiffs' licensed products that they create a likelihood of confusion as to the origin and the infringement upon the Plaintiffs' rights.

15. In or about July of 2004, I learned from several industry contacts that Global Prints, one of Impulse's vendors, was selling unauthorized posters. Later on that fall, I learned that Global had set up a sales tent on the campus of Boston College. In or about September 2004, I traveled to the Boston College campus from New York to determine whether any posters being sold at the sales tent were infringing. I observed that Global was offering for sale both licensed and unlicensed posters at its booth and I located and purchased approximately (20) twenty unlicensed posters from Global Prints. I subsequently contacted Paul

Kennedy at Global and warned him about his actions of infringement. He agreed that Global would cease selling all infringing products and would in the future only sell licensed product.

16. In early August 2005, I learned that Global Prints was operating a sales tent next to the Prudential Center in Boston. I had heard but did not have confirmation that Global was once again offering for sale unauthorized prints and was further actively marketing and promoting the upcoming sales of Global posters at various college campuses located throughout the United States. On or about August 4, 2005, I traveled to Boston and located the Global Prints tent. At that time I observed that Global was once again offering for sale a mixture of licensed and unlicensed designs.

17. I purchased numerous posters from Global that infringed upon either Impulse's rights and/or others' entities holding such rights, all of which are Plaintiffs in this action.

18. Many of the posters and prints do not bear appropriate trademark, copyright or licensing information. Accordingly, the consuming public is being mislead that these posters and prints being sold by Global are licensed designs, or are otherwise sponsored by or affiliated with the appropriate holders of the rights, when they are not.

19. In addition, I also learned that the Defendants are actively recruiting individuals to work for them and travel to various colleges and universities throughout the country starting in late August and early September of 2005, in time for the start of the school year. Upon information and belief, agents of the Defendants set up

tents at these colleges for one or more days to target students returning to campus. Since schools in the southern and central part of the United States begin school in mid to late August, trucks maintained by the Defendants and filled with posters and prints drive from Massachusetts to these states starting in the middle of August. Attached hereto is a copy of the flyer recruiting these individuals to work for Global as Exhibit "1."

20. After having purchased the infringing posters, I contacted Mr. Ally Mayer of Pyramid Posters and informed him about several unauthorized posters that I had purchased and of which I was aware were licensed by Pyramid. After forwarding him copies of the posters, Pyramid agreed to join in this action against Global.

21. In addition to selling the infringing posters at retail locations, I have also learned that the Defendants are maintaining a website from which unlicensed products can be purchased by the public.

22. The information that Impulse has been able to obtain to date indicates that the Defendants likely have on hand a large volume of infringing goods in order to meet demand during the upcoming back to school season. Accordingly, without the benefit of a seizure order, these infringing products will be disseminated to unknown third parties. August and September is one of the busiest seasons for poster companies, especially for the Defendants who travel to college campuses and ply their wares.

23. Prior to the commencement of this action, no agent, servant or employee of the Plaintiffs notified the Defendants of the contemplated action to move to obtain an

ex-parte seizure order. I made blind purchases solely to confirm that the Defendants were offering for sale unlicensed products.

24. In the Complaint, Impulse has requested the issuance of an ex-parte order in order to seize all infringing products currently in the possession of the Defendants. This request is predicated upon past experience in pursuing entities who infringe upon licensed rights. In those instances, even after securing an injunction, the offending parties sold off the infringing product to third parties.

25. It is undisputed that the Plaintiffs in this action are holders of appropriate trademark registrations granting them the exclusive right to promote, advertise, market and sell product under their trademarks.

26. I am aware that the Lanham Act specifically provides for the issuance of ex-parte seizure orders under 15 U.S.C. §1116 (d) in order to prevent against the disappearance of infringing product in the possession of parties against whom infringement actions have been commenced.

27. Here, Impulse seeks to have the infringing product turned over at the inception of the lawsuit in order to prevent the Defendants from selling, transferring and profiting from the sale of this infringing product.

28. Without the seizure of these goods, the Defendants will immediately transfer and sell these goods to third parties and be able to further profit from their illegal infringement.

29. Seizure of the goods will prevent any illegal transfer of the goods and provide Impulse with security for any judgment it stands to obtain in this litigation.

30. The ex-parte order is necessary to prevent further dissolution of the Plaintiffs' trademark rights and prevent further damage to its goodwill and business reputation.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 12th DAY OF AUGUST 2005.

_____
PATRICK SMITH,
CHIEF EXECUTIVE OFFICER
IMPULSE IMAGES, INC.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.