**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IMPULSE IMPORTS d/b/a IMPORT IMAGES, et. al.** ) | |
| ) | |
| **Plaintiffs** ) | |
| **v.** ) | **Civil Action No.** |
| ) | |
| **GLOBAL PRINTS, INC. d/b/a CAMPUS** ) | |
| **SALES, et. al.** ) | |
| ) | |
| **Defendants.** ) | |

## _PLAINTIFFS' OMNIBUS MOTION FOR MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION[1]_

## I.  INTRODUCTION

The Plaintiffs in this action are Impulse Imports d/b/a Import Images (hereinafter

"Impulse" or "Plaintiff"), Pyramid Posters Limited (hereinafter "Pyramid" or "Plaintiff"), Fifty-

Six Hope Road Limited (hereinafter "Fifty-Six Hope Road" or "Plaintiff"), Sheffield Enterprises,

Inc., (hereinafter "Sheffield" or "Plaintiff"), Lions Gate Entertainment, Inc. (hereinafter "Lions

Gate" or "Plaintiff"), Artisan Pictures, Inc. (hereinafter "Artisan" or "Plaintiff"), James Dean

Inc. (hereinafter "Dean, Inc." or "Plaintiff"), James Dean Foundation (hereinafter "Dean

Foundation" or "Plaintiff"),  Anthill Trading, Ltd. LLC (hereinafter "Anthill" or "Plaintiff"),

Pearl Jam, LLC (hereinafter "Pearl Jam" of "Plaintiff"), End of Music, LLC (hereinafter "End of

Music" or "Plaintiff"), Radiohead Trademark Limited Corp. (hereinafter "Radiohead" or

"Plaintiff"), Orion Pictures Corp. (hereinafter "Orion" or "Plaintiff"), a subsidiary of Metro-

Goldwyn-Mayer, Inc. (hereinafter "MGM" or "Plaintiff"), Universal Studios, Inc. (hereinafter

---

[1] The Plaintiffs are cognizant of Local Rule 7.1(b)(4) which prohibits memoranda from exceeding twenty (20) pages without leave of court.  However, since there are fifteen Plaintiffs in this action, the Plaintiffs chose to file one twenty-seven (27) page omnibus memorandum rather than fifteen separate memoranda.

"Universal" or "Plaintiff"), and Museum Masters International (hereinafter "Museum Masters"
or "Plaintiff") a division of ArtMerchandising & Media Inc., (hereinafter all Plaintiffs
collectively as "Plaintiffs"). The Plaintiffs are all entities that are the holders of certain
intellectual property rights and/or are licensed to use certain intellectual property rights. The
Plaintiffs, Impulse and Pyramid have entered into licensing agreements with licensors, trademark
and copyright holders to produce and manufacture posters and prints bearing entertainment
images and using the names of various musical artists, performers and famous photographs.
Plaintiffs contend that Global Prints, Inc. (hereinafter "Global") d/b/a Campus Sales and Paul
Kennedy (hereinafter "Kennedy" and collectively as "Defendants") are willfully and knowingly
infringing upon the Plaintiffs' rights by manufacturing, distributing and selling Infringing
Product, namely posters and prints.

> The Plaintiffs seek a preliminary injunction against the Defendants for 1)
> trademark infringement and federal unfair competition under the Lanham
> Act, 15, U.S.C. §§ 1114, 1125(a); 2) infringement and unfair competition
> under 15 U.S.C. §1125 (a); 3) copyright infringement arising out of the
> unlawful use of certain copyrighted photographs, in violation of the
> exclusive rights of the copyright holders under Section 106 of the
> Copyright Act of 1976, Title 17, United States Code; 4) infringement of
> the Common Law Right of Publicity and Commercial Appropriation of
> Celebrity Identity; and 5) common law trademark infringement, arising
> out of the Defendants' unauthorized manufacture, advertisement and sale
> of posters.

As explained more fully below, the Plaintiffs have demonstrated the appropriate criteria

for obtaining injunctive relief, warranting the issuance of an injunction against the Defendants.

## II.    STATEMENT OF FACTS

The Plaintiff, Impulse is a leading publisher of licensed posters and related articles and

has entered into licensing agreements authorizing Impulse to manufacture and sell posters and

2

prints of various musical artists, famous photographs, and other entertainment images to retail and wholesale establishments. Complaint, ¶2.

The Plaintiff, Pyramid is an internationally renowned publisher of posters and related articles and has entered into licensing agreements authorizing it to manufacture and sell posters and prints of various musical artists, famous photographs, feature films, and other entertainment images to retail and wholesale establishments. Complaint, ¶3.

Since approximately 1990, Hope Road, as the owner and exclusive licensor of the name "Bob Marley", has used the name, image, likeness, signature and other indicia of Marley in commerce on numerous products, including prints and posters. Complaint, ¶4. On or about June 1, 2003, Impulse entered into a licensing agreement with Fifty-Six Hope Road, which grants Impulse the non-exclusive right to manufacture, advertise, distribute and sell Bob Marley licensed products. Plaintiffs, Fifty Six Hope Road and Impulse have actively marketed and sold the Licensed Products within numerous geographical territories, including the Commonwealth of Massachusetts. Affidavit of Patrick Smith, ¶4.

The Plaintiff, Sheffield is the holder of certain intellectual property rights for the late legendary entertainer Frank Sinatra, Jr., including trademark registrations and rights of publicity in and to Frank Sinatra. Complaint, ¶5. Pyramid entered into a licensing agreement with Sheffield granting Pyramid the right to use these intellectual property rights on posters and prints. Plaintiffs, Sheffield and Pyramid have actively marketed and sold the Licensed Products within numerous geographical territories, including the Commonwealth of Massachusetts.

The Plaintiff, Artisan is affiliated with Artisan Entertainment, Inc. which holds the exclusive trademark and copyright rights to images from the major motion picture theatrical release "Reservoir Dogs". Complaint, ¶6. On or about August 10, 1999, Import Images entered

3

into a licensing agreement with Artisan regarding merchandising in connection with the motion picture "Reservoir Dogs". Under this Agreement, Impulse was given the non-exclusive rights as a licensee to produce, publish and posters bearing key art, still photographs, trademark and other images from the film. In 2001, this agreement was extended to include postcards and 8" x 10" posters. Affidavit of Patrick Smith, ¶5. Plaintiffs, Artisan and Impulse have actively marketed and sold "Reservoir Dogs" licensed products within numerous geographical territories, including the Commonwealth of Massachusetts. In 2003, Lions Gate Entertainment acquired Artisan. As a result of this acquisition, Lions Gate now holds the exclusive trademark rights to images from the major motion theatrical release "Reservoir Dogs."

The Plaintiff, Dean, Inc. is the exclusive holder of the intellectual property rights for the late actor James Dean (hereinafter "Dean") who became famous for his roles in three major movie theatrical releases: "East of Eden", "Giant" and "Rebel Without a Cause", and who came to symbolize and personify the restless American youth of the 1950's. Complaint, ¶9. On or about May 10, 2004, Impulse entered into a licensing agreement with Dean, Inc. which gave Impulse non-exclusive rights to use the name, likeness, voice, signature and visual representation of the late Dean in selling posters, post cards and greeting cards. Plaintiff, Dean, Inc. and Import Images have actively marketed and sold Dean licensed products within numerous geographical territories, including the Commonwealth of Massachusetts. Affidavit of Patrick Smith, ¶6.

The Plaintiff, Anthill is the holder of intellectual property rights for various musical bands and artists, including the alternative rock bank, Pearl Jam and musical performer Gordon Matthew Sumner, professionally known as Sting. Complaint, ¶11. On or about March 30, 2004, Impulse entered into a licensing agreement with Anthill which gave Impulse the non-exclusive rights to manufacture, distribute and sell products licensed by Anthill. This included designs,

4

characters, artwork, names, words, symbols, likenesses, trademarks, logographs and other indicia associated with individual bands, including Pearl Jam and Sting. Affidavit of Patrick Smith, ¶7. Plaintiff, Anthill and Impulse have actively marketed and sold Pearl Jam and Sting licensed products within numerous geographical territories, including the Commonwealth of Massachusetts.

The Plaintiff, Radiohead holds trademark rights to Radiohead, a popular international alternative music group. Complaint, ¶12. Pyramid entered into a licensing agreement with Radiohead granting Pyramid the rights to use the trademark on posters and prints. Plaintiff, Radiohead and Pyramid have actively marketed and sold Radiohead licensed products within numerous geographical territories, including the Commonwealth of Massachusetts.

The Plaintiff, End of Music holds trademark rights to the word mark Kurt Cobain ("Cobain"). Cobain is the late lead singer of the alternative rock group, Nirvana, which is famed for introducing and popularizing the "grunge" movement of American music in the 1990's. Complaint, ¶13. Pyramid entered into a licensing agreement granting Pyramid the rights to use the trademark on posters and prints. Plaintiff, End of Music and Pyramid have actively marketed and sold Radiohead licensed products within numerous geographical territories, including the Commonwealth of Massachusetts.

The Plaintiff, Orion holds rights to the use of the word mark "Army of Darkness,". Complaint, ¶14. Impulse entered into a licensing agreement with MGM, the parents company of Orion which grants Impulse the right to use the mark "Army of Darkness" on posters and prints. Affidavit of Patrick Smith, ¶10. Plaintiffs, Orion and Impulse have actively marketed and sold "Army of Darkness" licensed products within numerous geographical territories, including the Commonwealth of Massachusetts.

5

The Plaintiff, Universal Studios, Inc. holds copyrights for the movie poster entitled "Army of Darkness", Registration number VA-563-990 listed on the Principal Registrar with the United States Copyright Office. Universal also holds federal copyright registration for the movie poster entitled "Carlito's Way", Registration number VA-605-454 listed on the Principal Registrar with the United States Copyright Office. Complaint, ¶50. On or about June 30, 2000, Impulse and Universal entered into a Master Merchandising License Agreement granting Impulse merchandising rights to posters and prints of images from "Army of Darkness" and "Carlito's Way". Affidavit of Patrick Smith, ¶9. Plaintiffs, Universal and Impulse have actively marketed and sold "Army of Darkness" and "Carlito's Way" licensed products within numerous geographical territories, including the Commonwealth of Massachusetts.

The Plaintiff, Museum Masters is a division of ArtMerchandising & Media, Inc., an authorized licensing and collection agent for Demart Pro Arte B.V. which represents the Estate of Salvador Dali. Museum Masters is the holder of trademark and copyright registrations in the word mark Salvador Dali. Complaint, ¶15. On or about May 23, 2003, Impulse entered into a licensing agreement with Museum Masters giving Impulse the right to manufacture, distribute and sell posters of images and works of the artist Salvador Dali. The territory granted under this agreement included North America. Affidavit of Patrick Smith, ¶8. Plaintiffs, Museum Masters and Impulse have actively marketed and sold Dali licensed products within numerous geographical territories, including the Commonwealth of Massachusetts.

The Defendants are in the business of manufacturing, distributing and selling prints and posters and upon information and belief, the Defendants have been manufacturing, distributing and selling prints and posters (hereinafter "Infringing Product") which infringe upon the

6

Plaintiffs' rights. Defendants have never sought or obtained a license to manufacture, distribute or sell the Licensed Product. Affidavit of Patrick Smith, ¶14

In or about July of 2004, Patrick Smith ("Smith") the Chief Executive Officer of Impulse learned from several industry contacts that Global Prints, a vendor of Impulse, was selling unauthorized posters, without any legal right or license to do so. Affidavit of Patrick Smith, ¶15. In or about the fall of 2004, Smith learned that a Global Prints sales tent would be set up on the Boston College campus at the start of the school year. In or about September, 2004, Smith traveled to the Boston College campus from New York to determine whether any posters being sold at the sales tent were infringing. Affidavit of Patrick Smith ¶15. Global was offering for sale both licensed and unlicensed posters at its booth and Smith located and purchased approximately (20) twenty unlicensed posters from Global Prints. Upon examination Smith determined that all of these posters infringed upon the either Impulse's rights as licensee and/or others' entities holding such rights. Global was subsequently contacted by Import Images and other intellectual property holders and warned about its actions of infringement. Global agreed that it would cease all infringing activities and distribute only licensed product. Affidavit of Patrick Smith, ¶15.

In or about August, 2005, Smith learned that a Global Prints sales tent was operating next to the Prudential Center in Boston. Affidavit of Patrick Smith, ¶16.    Smith again learned from industry contacts that Global was continuing to offer for sale unauthorized prints and was further actively marketing and promoting the upcoming sales of Global posters at various college campuses throughout the United States. On or about August 4, 2005, Smith traveled to Boston and located the Global Prints tent. Smith observed that Global was once again offering for sale a mixture of licensed and unlicensed designs. Affidavit of Patrick Smith, ¶16.  Smith purchased

numerous posters from Global that infringed upon either Impulse's rights as licensee of said licensed products and/or others' entities holding such rights, all of which are Plaintiffs in this action.

The Defendants' sale, distribution and manufacture of Infringing Product constitutes trademark and copyright infringement of the world famous musical artists', performers' and entertainment images' trademarks and copyrighted images and photographs. Complaint, ¶28. Unless an injunction is issued, the Plaintiffs' reputation and goodwill will continue to be damaged and the consuming public will continue to be deceived, as a result of Defendants' infringement of the Plaintiffs' federally registered trademark and copyrights.

## III.    ARGUMENT

### A.    *TRADEMARK LAW*

1.    The Preliminary Injunction Standard

"Trademark law seeks to prevent one seller from using the same mark as or one similar to that used by another in such a way that he confuses the public about who really produced the goods." DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir. 1991). A primary purpose of trademark protection is "to protect that which identifies a product's source." I.P. Lund Trading ApS & Kroin, Inc. v. Kohler Co. and Robern, Inc. 163 F.3d 27, 32 (1st Cir. 1998); citing Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 162 (1995). The right to seek injunctive relief is codified under the Lanham Act:

(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. (15 U.S.C., §1125 (c)).

8

In a trademark case, a district court may grant a preliminary injunction when it concludes that a plaintiff has demonstrated: (a) the likelihood of success on the merits; (b) the potential for irreparable harm if the injunction is not granted; (c) the balance of the relevant impositions; and (d) the effect if any on the public interest. See generally, I.P. Lund Co., 163 F.3d 27; Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1989); Weaver v. Henderson, 984 F.2d 11 (1st Cir. 1993). For the reasons set forth below, the Plaintiffs can demonstrate the requisite elements entitling them to the issuance of an injunction against the Defendants' willful infringement of its rights.

### A. Likelihood of Success on the Merits

In the injunction context, likelihood of success is the main bearing wall of the four-factor framework. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). In trademark infringement cases, likelihood of success is often the central issue for establishing an entitlement to relief. Keds Corp., 888 F.2d at 220.

To establish a trademark infringement claim under the Lanham Act, a plaintiff must demonstrate that a defendant used in commerce, without the plaintiff's consent, a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with which such use is likely to cause confusion." 15 U.S.C. § 1114(1) (a). A plaintiff must show that "it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." Gruner & Jahar USA Publishing v. Meredith Corp., 991 F.2d 1072, 1075 (2d. Cir. 1993). Section 43(a) of the Lanham Act "provides protection against the use of 'any word, term, name, symbol, or device' that 'is likely to cause confusion, or to cause mistake, or to deceive' as to the source of a product." I.P. Lund., 163 F.3d at 33; citing 15 U.S.C §1125(a).

9

The Plaintiffs are the owners of federal trademark registrations which identifies them with the consuming public as the source of licensed products bearing the name and marks represented thereon, including the rights to use same on posters and prints. Registration by a plaintiff of its mark on the Principal Register raises a legal presumption of validity. See, 15 U.S.C. §1115 (a) (registration of mark on Principal Register "shall be prima facie evidence of the validity of the registered mark … and of the registrant's right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate"). Section 1115(a) entitles the registrant to a presumption that its registered mark is inherently distinctive, as opposed to merely descriptive. Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 161 (1st Cir. 1977) (federal registration is prima facia evidence that such mark has become distinctive of the goods in commerce).   The Plaintiffs' registration of their trademarks combined with their extensive efforts used to promote the trademarks in trade and commerce demonstrates that they have marks entitled to protection against all other users of any similar or identical mark. Gruner, 991 F.2d at 1076.

"Once the determination has been made that a term is entitled to trademark protection, the pivotal inquiry becomes whether the allegedly infringing mark is likely to cause consumer confusion." Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993). In the First Circuit, this determination is based upon an analysis of eight separate factors. See, Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 2-3 (1st Cir. 1993). The factors include: 1) the similarity of the marks; 2) similarity of the goods; 3) channels of trade; 4) channels of advertising; 5) class of prospective purchasers; 6) evidence of actual confusion; 7) defendant's intent in adopting the mark; and 8) strength of the mark. Id. The list is not exclusive

10

and analysis of the factors "is not a mechanical process." Keds Corp., 888 F.2d at 222;

Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 70 (2d Cir. 1994).

Analyzing these factors it is apparent that confusion of the public is occurring and will

continue to occur unless an injunction is granted.

In determining a trademark's relative strength, the Court examines "the length of time a

mark has been used and the relative renown in its field; the strength of the mark in the plaintiff's

field of business; and the plaintiff's action in promoting the mark." Keds Corp., 888 F.2d at 222,

quoting, Boston Athletic Association v. Sullivan, 867 F.2d 22, 32 (1st Cir. 1989).

Over the years, the Plaintiffs have expended considerable resources in establishing their

respective trademarks in the minds of customers as a source of high quality products.

Specifically, Impulse has been doing business under the trade name Import Images in New York

since 1994, as distributor of licensed posters. Complaint, ¶2.  Impulse is a leading publisher of

licensed posters and related articles and has actively marketed and sold licensed posters through

tradeshows, events, direct marketing and over the internet, including in Massachusetts.  Impulse

has numerous customers in Massachusetts.  Impulse is well known in the poster industry as a

source of high quality licensed posters for musicians, photographers, bands, feature films, art and

other entertainment images.

Pyramid is an internationally renowned publisher of posters and related articles with its

principal operations located in the United Kingdom.  Pyramid has entered into licensing

agreements authorizing it to manufacture and sell posters and prints of various musical artists,

famous photographs, feature films, and other entertainment images to retail and wholesale

establishments.  Complaint, ¶3.  Pyramid has actively marketed and sold its licensed products

both abroad and here in the United States, including Massachusetts through advertisements,

11

tradeshows and over the internet. Pyramid maintains accounts with numerous customers in the Commonwealth of Massachusetts.

Hope Road is the exclusive holder of the intellectual property rights for the late great reggae performer, Robert Nesta Marley a/k/a Bob Marley. Prior to his death, Marley was a singer and performer who gained worldwide renown for his image, name, likeness, music and performances. For many years before his death, Marley worked diligently to become and became an extremely successful songwriter, vocalist, musician, and recording artist. Hope Road is the owner of federal trademark registration for the name Bob Marley. Hope Road is also the holder of a Trademark Registration issued by the Commonwealth of Massachusetts. Hope Road has actively marketed and sold its licensed products throughout the world including the United States and the Commonwealth of Massachusetts, through licensed agents including Impulse and Pyramid. Complaint, ¶4.

Sheffield is the holder of certain intellectual property rights for the late legendary entertainer Frank Sinatra, Jr., including trademark registrations in and to the name Frank Sinatra, Frank Sinatra, Jr. and Sinatra listed on the Principal Register with the United States Patent and Trademark office. Sheffield further is the holder of the rights to publicity in and to Frank Sinatra. Complaint, ¶5. Sinatra was one of the most notable and recognizable musical artists and entertainers of the 20th century. In a career expanding over six decades, Sinatra performed countless classic favorites, including "Love and Marriage", "It Was a Very Good Year", "My Way" and "Strangers in the Night". Sinatra died in 1998 at the age of 82.

Artisan Pictures is a major movie studio with principal offices in Santa Monica, California. Artisan is affiliated with Artisan Entertainment, Inc. which holds the exclusive trademark rights to images from the major motion picture theatrical release "Reservoir Dogs".

12

Complaint, ¶6.  Reservoir Dogs was a feature film directed by Quentin Tarantino and starred

Harvey Keitel, Tim Roth, Chris Penn, Steve Buschemi, Michael Madsen and Lawrence Tierney.

Lions Gate Entertainment is another major movie studio located in Santa Monica, California.  In

2003, Lions Gate acquired Artisan.  As a result of this acquisition, Lions Gate now holds the

exclusive trademark rights to images from the major motion theatrical release "Reservoir Dogs."

James Dean was an actor who became famous for his roles in three major movie

theatrical releases: "East of Eden", "Giant" and "Rebel Without a Cause", and who came to

symbolize and personify the restless American youth of the 1950's.  Dean Inc. holds certain

intellectual property rights as a licensor to the use the image, name, likeness, signature and voice

of James Dean and has authorized others to use the image on products such as posters, including

Pyramid and Impulse.  Complaint, ¶8.  The James Dean Foundation is the owner of a formally

registered trademark for the name James Dean, and is the holder of the common law trademark

rights.

Pearl Jam is the owner of federal trademark registrations for the name Pearl Jam.

Complaint, ¶10.   Pearl Jam is a popular musical act started in 1991.  Pearl Jam became during

the nineties one of the most influential musical acts known for following its own way in the

music industry.  Pearl Jam has actively marketed and sold its products (including posters)

through Anthill Trading and through the internet, tradeshows and at concerts, including in the

Commonwealth of Massachusetts.

Radiohead Trademark is a company located in London, United Kingdom.  Radiohead

holds federal trademark registration for the name Radiohead.  Complaint, ¶12.   Radiohead is a

popular international alternative music group who has actively marketed and sold its products

throughout the world.

End of Music is a company located in California. End of Music holds federal trademark registration for the word mark Kurt Cobain ("Cobain"). Cobain is the late lead singer of the alternative rock group, Nirvana, which is famed for introducing and popularizing the "grunge" movement of American music in the 1990's. Complaint, ¶13. End of Music has actively marketed and sold licensed products, including posters through all available channels of trade and has sold products within the Commonwealth of Massachusetts.

Metro-Goldwyn-Mayer is a major movie studio located in Los Angeles, California. MGM is the parent company for Orion Pictures, which holds federal trademark registration for the word mark "Army of Darkness", listed on the Principal Register with the United States Patent and Trademark office. Complaint, ¶14. Army of Darkness was a movie released in 1993 written by Sam Raimi and Ivan Raimi and directed by Sam Raimi. Orion has actively marketed and sold products including posters for Army of Darkness.

Universal Studios is a major movie studio located at Universal City, California. Universal holds federal copyright registration for the movie poster entitled "Army of Darkness", Registration number VA-563-990 listed on the Principal Registrar with the United States Copyright Office. Universal also holds federal copyright registration for the movie poster entitled "Carlito's Way", Registration number VA-605-454 listed on the Principal Registrar with the United States Copyright Office. Complaint, ¶16.

Museum Masters is a division of ArtMerchandising & Media located in New York. ArtMerchandising is an authorized licensing and collection agent for Demart Pro Arte B.V. which represents the Estate of Salvador Dali. Museum Masters holds trademark and copyright registrations regarding use of the mark "Dali". Complaint, ¶15.

14

The Defendants in this case are aware of the exclusive rights of the Plaintiffs in regard to these products. The Defendants have in the past been engaged in the sale of licensed posters and in fact currently offers for sale both licensed product mixed in with unlicensed product. The use by Defendants of the trademarks on their Infringing Products is likely to cause confusion or mistake or deception to the consuming public as to the source of origin of those goods. Purchasers are likely to purchase Defendants' goods bearing the respective trademarks believing they are Plaintiffs' authorized products.

The Defendants are using a counterfeit, copy and rendition of the musical artists, entertainers and performers on their products in near identical fashion to the trademark used by the Plaintiffs. The Defendants are then selling them along side licensed products. Affidavit of Patrick Smith, ¶15, 16. Undoubtedly the consuming public will be confused by the Defendants use of the Plaintiffs' trademarks and will mistake Defendants' goods for those of Plaintiffs' licensed goods. Moreover, the Defendants are using the trademark on prints and posters, the very same products upon which the Plaintiffs promote and commercially use the trademarks. In addition, the Defendants are marketing, selling, advertising and distributing their product to the same prospective customers and in the same channels of trade that the Plaintiffs use to market, advertise, sell and promote its products. The Defendants without right or justification have been infringing upon the rights of the Plaintiffs by manufacturing, distributing and selling posters that infringe upon the marks purposely for Defendants own pecuniary gain. Defendants will be unable to produce any evidence as justification for its willful and knowing violation of the Plaintiffs' rights. The actions of Defendants have been willful and done solely with the intent of palming off their goods as those of the Plaintiffs. Defendants were contacted and warned to cease their infringing activity nearly a year ago. Affidavit of Patrick Smith, ¶15. Instead of

15

honoring their agreement to refrain from selling infringing posters, the Defendants have instead persisted in palming off their goods to the public.

All of these factors establish that prospective purchasers are likely to be misled and in fact are being misled and confused as to the source of the Infringing Product because of its entrance into the market by Defendants. Such action is damaging the Plaintiffs' goodwill and reputation in the industry resulting in irreparable harm to Plaintiffs. Injunctive relief is appropriate in this instance to protect the Plaintiff's trademark. Boston Beer, 9 F.3d at 180 (prohibiting the use of a mark that is "likely to cause confusion, or to cause mistake or to deceive"). As noted above, the "likelihood of success is the touchstone of the preliminary injunction inquiry." Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 673 (1st Cir. 1998). Here, the evidence is overwhelming that the Plaintiffs stand to suffer and are suffering damage to their goodwill and reputation by Defendants' deliberate infringement of its rights in palming off their goods as those of Plaintiffs or giving the consuming public the impression that the Defendants goods are associated with or sponsored by the Plaintiffs. Accordingly, the Plaintiffs have demonstrated a likelihood of success on the merits on its claims for infringement and unfair competition warranting the issuance of an injunction.

### B.    Irreparable Harm

Under Fed. R. Civ. P. 65 (a) the burden of demonstrating irreparable harm is upon the movant. Narragansett Indian Tribe v. Guilbert, 934 F.2d 4 (1st. Cir. 1991). However, in trademark cases, "irreparable harm may be shown even in the absence of actual injury to plaintiff's business based upon the plaintiff's demonstration of a likelihood of success on the merits on its claim." Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994, 1013 (D. Mass. 1988), citing Camel Hair, 799 F.2d. at 14.

16

As noted above, the Plaintiffs have expended considerable resources in establishing the various trademarks in the minds of customers as sources of high quality products endorsed by the musical artists, performers and entities holding rights as licensors. These Plaintiffs are well known throughout the United States, the United Kingdom and the world as the sources of origin for authorized products, including but not limited to posters, prints and the like. The use by Defendants of the trademarks on their Infringing Product, especially when they are being marketed and sold along side licensed products, is undoubtedly likely to cause confusion or mistake or deception to the consuming public as to the source of origin of those goods. Purchasers are likely to purchase Defendants' goods bearing these trademarks believing they are Plaintiffs' authorized product. The Plaintiffs have no control over the quality of the goods sold by the Defendants, and because of the confusion as to the source engendered by the Defendants, the Plaintiffs' valuable goodwill and reputation in respect to their trademark will be irreparably harmed. Under the Lanham Act, such damage is sufficient to warrant the issuance of an injunction. See, TEC Engineering Corp. v. Budget Molders Supply, Inc., 927 F.Supp. 528 (D.Mass. 1996) (public interest factors require liberal interpretation of irreparable injury factor used to determine whether preliminary injunction is warranted in infringement action); LeSportsac, Inc. v. K-Mart Corp., 754 F.2d 71 (2d. Cir. 1985) (bag manufacturer established irreparable injury warranting injunction against retailer marketing lightweight travel bags in mark and dress similar to that of plaintiff); Body Support Systems, Inc. v. Blue Ridge Tables, Inc., 934 F.Supp. 749 (1996) (threatened loss of goodwill if competitor not preliminarily enjoined was sufficient threat of irreparable injury warranting issuance of injunction); Warner Vision Entertainment Inc. v. Empire of Carolina, Inc., 915 F.Supp. 639 (S.D.N.Y. 1996).

17

The Plaintiffs stand to suffer substantial injury to the goodwill that they have spent years cultivating in their protected properties such that monetary damages will be insufficient to restore the loss of goodwill. In such instances, "if a plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable injury is a natural sequel." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989). "By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable." Ross-Simons of Warwick, 103 F.2d at 18, citing, Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 14-15 (1st Cir. 1986).

Here, the continued use by the Defendants of the registered trademarks on its products has caused confusion and mistake and deception of purchasers as to the source of origin of its goods which falsely suggest that its Infringing Products are sponsored by, licensed by or otherwise affiliated with the Plaintiffs. These actions constitute trademark infringement and are in violation of, inter alia 15 U.S.C. § 1114, § 1125(a) and G.L. c.110B. The infringement by the Defendants has been willful and deliberate, designed specifically to trade upon the enormous goodwill associated with Plaintiffs' trademarks. The goodwill of the Plaintiffs' business under their registered trademarks is of enormous value, and the Plaintiffs will suffer irreparable harm should infringement be allowed to continue to the detriment of their trade reputation and goodwill. Plaintiffs have no adequate remedy at law available and are suffering and will continue to suffer irreparable harm and damages as a result of the aforesaid acts of Defendants, unless Defendants are enjoined and restrained from the manufacture, distribution, advertisement and sale of the Infringing Products.

18

### C.    The Balance of Harms

The grant of a preliminary injunction prohibiting the Defendants from advertising, marketing, distributing and selling and/or in any manner utilizing the protected properties of Plaintiffs on any product and enjoining the Defendants from any other actions of infringement upon the Plaintiffs' rights poses no substantial harm to Defendants. Rather, any damage the Defendants may sustain by being restraining from continuing to palm off their inferior product as that of the Plaintiffs' pales in comparison to the damage and continued threat of damage to the Plaintiffs' goodwill and reputation if an injunction does not issue. See, Cadence Design Systems, Inc. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) ("A defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist its infringing activities"). Injury to goodwill and reputation is not easily measurable and by its very nature is irreparable. Ross-Simons of Warwick, 103 F.2d at 18, citing, Camel Hair, 799 F.2d at 14-15. The attempt to quantify the extent of irreparable harm is not weighed in a vacuum, "rather the predicted harm and likelihood of success on the merits must be juxtaposed and weighed in tandem when determining whether interim injunctive relief is warranted." EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996).

Here, the Defendants can proffer no justification for their infringement and use of the federally registered trademarks of Plaintiffs without any authorization from Plaintiffs. Simply stated, Defendants cannot be harmed by being restrained from doing what they have never had the colorable right to do. Even after Plaintiffs presented evidence to the Defendants that their activity was infringing upon Plaintiffs' rights, the Defendants have refused to stop using the Plaintiffs' trademarks. Rather than being harmed, the Defendants are merely being required to

19

refrain from illegally and intentionally palming off their infringing product as that of the
Plaintiffs.

      D.      The Issuance of an Injunction is in the Public Interest

The public interest will clearly be served by the issuance of an injunction. Over the
years, the Plaintiffs have expended considerable resources in establishing their trademarks in the
minds of customers as sources of high quality product endorsed by the respective artists,
performers and heirs of the same. The Plaintiffs are well known throughout the United States,
the United Kingdom, and the world as a source of origin for authorized products, including but
not limited to posters, prints and the like. The use by Defendants of the trademarks on their
Infringing Product is likely to cause confusion or mistake or deception to the consuming public
as to the source of origin of those goods. Purchasers are likely to purchase Defendants' goods
bearing the trademarks believing they are Plaintiffs' authorized product.

The issuance of an injunction would serve to prevent the Defendants from continuing to
palm off their goods as those of the Plaintiffs and will further prevent them from continuing to
mislead and deceive the public that the goods being sold by the Defendants are sponsored by or
affiliated in any manner with the Plaintiffs. The actions of the Defendants directly effect the
sales of licensed products which in turn in some instances results in higher prices being charged
to consumers to make up for shortfalls. Eradicating the infringing activities is in the interest of
the public.

      *B.*      *COPYRIGHT LAW*

      1.      The Preliminary Injunction Standard

Copyright laws seek to protect "original works of authorship" that are "fixed in any
tangible medium of expression." 17 U.S.C. § 102(a). This includes protection for original

20

photographs, artwork, books, screenplays and soundtracks. A work is considered original for copyright purposes if it is created entirely by an author rather than copied. Feist v. Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). See Lotus Dev. Corp. v. Borland, Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995) (burden on copyright holder to demonstrate work when viewed as a whole is original). Copyright protection only protects the tangible medium of expression itself and not the ideas behind it. 17 U.S.C. § 102(b). Similarly, copyright protection does not extend to anything created entirely independently.

17 U.S.C. § 502(a) provides for the availability of injunctions in copyright infringement cases. The courts can issue preliminary injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of the copyright". See 17 U.S.C. § 502(a). The standard in the First Circuit for obtaining a preliminary injunction for copyright infringement is a (1) likelihood of success on the merits; (2) irreparable harm and no adequate remedy at law; (3) that the injury to the plaintiff from withholding the relief sought would exceed the injury to the defendant if the relief were granted; and (4) that an award for preliminary injunction will not harm the public interest. See, Latin American Music Company, Inc., et. al. v. Cardenas Fernandez  Assoc., Inc., et. al., 57 U.S.P.Q. 2d 1950 (1st Cir. 2001; Concrete Mach. v. Classic Lawn Instruments, Inc, 843 F.2d 600, 611 (1st Cir. 1988); AccuSoft Corp. v. Mattel, Inc., 117 F. Supp. 2d 99, 100 (D. Mass. 2000).

A.      Likelihood of Success on the Merits.

To establish a copyright infringement claim, the party alleging the infringement must show 1) ownership of a valid copyright and 2) a copying of the original protected work. See, Feist, 499 U.S. at 361 (citations omitted). If direct evidence of copying is not available, the Plaintiff can prove this second element, that the work was copied rather than created

21

independently, indirectly. This is done by showing the Defendant had access to the original

work and that there is a "probative similarity" between the protected original work and the

infringing work or that the infringing work is substantially similar to the original. Access is

proven by the Plaintiff's evidence that the Defendant viewed or had opportunity to view the

protected work. See, Jorgensen v. Epic/Sony Records, 351 F.3d 46, 53-55 (2d Cir. 1993) ;

Kregos v. Associated Press, 3 F.3d 656, 663 (2d Cir. 1993); Moyna, LLC v. Victoria's Secret

Direct N.Y., LLC, 67 U.S.P.Q.2d (BNA) 1743, 1747 (S.D.N.Y. 2003).

Registration certificates are prima facie evidence of copyright ownership in showing

copyright infringement. See 17 U.S.C. § 410(c). In this case, the Plaintiffs have established

their ownership of valid copyrights by the fact they have registered and received copyright

registration for their copyrightable works.    See Complaint, ¶50-51.    In turn, those entities

possessing the valid copyright ownership have entered into agreements with Pyramid and

Impulse to produce and manufacture licensed copies.

The Defendants are offering for sale exact copies of Plaintiffs' copyrighted works. In

fact, in some instances, the Defendant is selling the copyrighted and non-copyrighted versions of

the posters side by side. Affidavit of Patrick Smith, ¶15-16.. Moreover, it is undisputed that the

Defendants in this matter had access to these copyrighted works. The Defendants have been in

the poster business for years and has in the past purchased licensed versions for resale. The

Defendant has gone further and illegally copied and is offering for sale unauthorized copies of

the works. All the moving parties must show is that the Defendants had ample opportunity to

copy the original works. See Grubb v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996). The

Defendants are in the business of poster manufacturing and production and are in possession of

authorized copies of the protected works. The Defendants have machinery in which to duplicate

22

and create posters and prints. Since it is undisputed that the Defendants have had unfettered access to these copyrighted works it is apparent that Defendants have without right or justification gone ahead and created their own copies at their warehouse.

Additionally, it is undisputed that there is a "probative similarity" between the original works and the copied works. The posters are identical to those photographs and prints registered by the Plaintiffs with the United States Copyright Office. In this case, since the Defendants have copied original works from copyright owners without a license to do so, they are in violation of the federal copyright statute. Patrick Smith of Impulse is familiar with the copyrighted images for which Impulse has entered into licensing agreements. Therefore, Smith was able to readily determine which posters and prints being offered for sale at Global's tents were infringing. True copies of the unauthorized copies are attached to the Complaint.

    B.    Irreparable Harm and No Adequate Remedy at Law.

In copyright cases, "irreparable harm is usually presumed if likelihood of success on [a] copyright claim has been shown." Latin American, 57 U.S.P.Q. 2d at 1592; citing Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611 (1st Cir. 1988).

While monetary damages are available under 17 U.S.C. § 504, these types of damages are often difficult to prove. See generally, Walker v. Forbes, Inc., 28 F.3d 409 (4th Cir. 1994). Although actual damages, including profits are available as a remedy in copyright infringement actions, proving these damages can be time consuming and there is a high likelihood of inaccuracy in determining those profits that derived from the sale of Infringing Product. The Defendants have been selling a variety of posters and prints over the years to hundreds and thousands of third parties all over the United States and throughout the world. The Defendants are selling licensed and unlicensed designs side by side. Therefore, it is difficult to determine

23

how much of the Defendants' profits have been derived from unlicensed works compared to licensed works. Proving actual damages to each Plaintiff in this matter would be extremely tedious for this reason.

Additionally, although the Defendants presumably may keep records as to their manufacturing and sales, the nature of their business requires the construction of makeshift retail outlets throughout the country. As stated in the Complaint, the Defendants derive much of their profits in August and September by sales of posters and prints on college and university campuses. These temporary establishments more than likely do not employ any sophisticated method of accounting or accurate record keeping for sales of posters made. The Global tent set up on a semi-permanent basis outside the Prudential Center, where Smith made his August 2005 purchases only had a calculator, a credit card processing machine and provided hand written receipts indicating which posters and/or print(s) had been purchased. These descriptions of the products are general at best and only name the artist or image on the poster. Since the Defendants are selling a variety of posters and prints, it would be next to impossible to determine the precise amount of profits derived for each specific image.

Most important is the fact that actual damages will never be able to remedy the loss of goodwill and reputation in the eyes of the consumer that the Plaintiffs suffer when illegitimate copies are produced and sold to the public. Injury to goodwill and reputation is not easily measurable and by its very nature is irreparable. Ross-Simons of Warwick, 103 F.2d at 18, citing, Camel Hair, 799 F.2d at 14-15. The attempt to quantify the extent of irreparable harm is not weighed in a vacuum, "rather the predicted harm and likelihood of success on the merits must be juxtaposed and weighed in tandem when determining whether interim injunctive relief is warranted." EEOC, 94 F.3d at 743. As in other areas of intellectual property law, an injunction

24

preventing the Defendants from producing and selling these images in the future is the most effective remedy for the Plaintiffs. By selling unlicensed copies of these images, the Defendants have willfully harmed actual copyright holders, licensors and licensees by causing confusion to the general public. In this case, the Defendants have even admitted to infringing upon Plaintiffs' rights and have continued to sell the unlicensed products anyway. See Affidavit of Ally Mayer. The value of the Plaintiffs' copyrighted images has been diluted and the Defendants' willful actions of continuing to produce, manufacture and profit from this infringement constitutes irreparable harm to the Plaintiffs.

C.    The Injury to Plaintiff if the Injunctive Relief is not Granted is Greater than the Injury to the Defendant

As in the case of granting a preliminary injunction prohibiting the Defendants from advertising, marketing, distributing and selling and/or in any manner utilizing the trademarks of any of the above-named Plaintiffs, the Defendants will not suffer any greater harm than the Plaintiffs will without the relief sought. As already stated, any damage the Defendants may sustain by being prevented from continuing to sell their copied images of protected photographs and posters is far less than the continuing damage the Plaintiffs' goodwill and reputation will suffer if an injunction is not granted.

Here, the Defendants can proffer no justification for their infringement and sale of these unlicensed images. Simply stated, Defendants cannot be harmed by being restrained from doing what they have never had the colorable right to do. Even after Plaintiffs confronted the Defendants, and the Defendants admitted that their activity was intruding upon Plaintiffs' rights, the Defendants refused to stop selling these products for which they had no right to sell in the

25

first place. Rather than being harmed, the Defendants are merely being required to refrain from illegally and intentionally palming off their infringing product as that of the Plaintiffs.

### D.    The Issuance of an Injunction is in the Public Interest

The public interest will clearly be served by the issuance of an injunction. Over the years, the Plaintiffs have expended considerable resources in establishing their trademarks in the minds of customers as sources of high quality products endorsed by the respective artists, performers and heirs of the same. The Plaintiffs are well known throughout the United States, the United Kingdom, and the world as a source of origin for authorized products, including but not limited to posters, prints and the like. The use by Defendants of the trademarks on their Infringing Product is likely to cause confusion or mistake or deception to the consuming public as to the source of origin of those goods. Purchasers are likely to purchase Defendants' goods believing they are Plaintiffs' authorized original copyright protected product.

The issuance of an injunction would serve to prevent the Defendants from continuing to palm off their goods as those of the Plaintiffs and will further prevent them from continuing to mislead and deceive the public that the goods being sold by the Defendants are sponsored by or affiliated in any manner with the Plaintiffs.

26

## REQUEST FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court

grant its application for preliminary injunction against the Defendants for the reasons set forth in

this memorandum.

Respectfully submitted,

Impulse Images, Inc. d/b/a Import Images
By its attorneys,


TIMOTHY J. ERVIN, (BBO# 567042)
JOHN F. GALLANT (BBO#547951)
GALLANT & ERVIN, LLC
Suite 103
One Olde North Road
Chelmsford, MA  01824
(978) 256-6041
(978) 256-7977 (fax)

Date: _____